# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

       Plaintiff/Respondent,

**MEMORANDUM OPINION
AND ORDER**

v.
Crim. No. 11-228 (03) (MJD)

Patrick Joseph Kiley,

       Defendant/Petitioner.

_____

     David J. MacLaughlin and Tracy L. Perzel, Assistant United States Attorneys, Counsel for Respondent.

     John W. Lundquist and Kevin C. Riach, Fredrikson & Byron, P.A., Counsel for Petitioner Patrick Kiley.

_____

     This matter is before the Court upon Petitioner Patrick Kiley's Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255.

     In order to be entitled to the relief sought in this petition, Kiley must demonstrate that 1) his trial counsel had an actual conflict of interest; and 2) that such conflict adversely affected his performance at trial. For the reasons stated below, the Court finds that Kiley has failed to meet this burden.

## I.    Introduction

Following an eight week trial, Patrick Kiley was found guilty of multiple

counts of wire fraud, mail fraud, money laundering and conspiracy to commit

wire and mail fraud. These convictions arose from a Ponzi scheme that operated

between July 2006 and July 2009, in which Kiley and others received over $193

million from hundreds of investors.  The evidence presented at trial

demonstrated that Kiley and others defrauded victims by convincing them to

invest their money in a sham currency program.  For his part, Kiley had a radio

show called "Follow the Money" during which he embellished his financial

background and promoted the currency program to his listeners.  Through this

show, Kiley successfully recruited a number of investors in the currency program

by assuring them their money would be kept in a separate account and that they

would be able to get their money back at any time.  The evidence at trial also

demonstrated that Kiley attended many meetings with co-conspirators and that

he had direct control over bank accounts in the name of Crown Forex LLC and

Basel Group LLC; each of which held millions of dollars of victim funds.

## II.    Procedural History

### A.    Motion for Inquiry

Prior to trial, the government filed a motion for inquiry, asking the Court to inquire as to whether Kiley's defense counsel, H. Nasif Mahmoud, may be a necessary witness at trial and whether Mahmoud had an actual or potential conflict of interest with one former client and one current client. [Doc. No. 80] In addition, if the circumstances warranted, the government requested that the Court secure appropriate waivers of the conflict or issue an order of disqualification. The matter was referred to the Magistrate Judge for hearing.

In the motion to inquire, the government asserted that during a pretrial phone conference, Mahmoud informed the government that he flew to Minneapolis in July 2009, at Kiley's request, to attend a number of meetings with co-conspirator Trevor Cook[1], Kiley and various attorneys to discuss the <u>Phillips</u> lawsuit[2]. He further informed the government that while in Minneapolis, he had stayed at the Van Dusen mansion, which was the locus of the fraudulent activity charged in the Indictment. He also stated that Cook specifically told him that Cook initiated the wire transfer that was the subject of the money laundering

---

[1]Cook was charged in a separate Indictment. <u>United States v. Trevor Cook</u>, Crim. No. 10-75.

[2]On July 7, 2009, a number of victim investors filed a civil action against Trevor Cook, Kiley d/b/a UBS Diversified, and others, asserting claims of breach of contract and fraud. <u>Phillips et al v. Cook et al.</u>, No. 09-1732. That case ultimately exposed the ponzi scheme at issue in this case.

asserted in Count 23, and that Mahmoud was the recipient of such funds. Based on that information, the government raised the concern that Mahmoud may have to be a witness at trial.

Following the hearing on the government's motion, the Magistrate Judge found that it was "undisputed that the attorney referenced in Count [23] is Mr. Mahmoud, whom Defendant Kiley had retained in a related civil action" and that there were other attorneys present at the meetings at the Van Dusen mansion who could testify as to what happened. Based on the submissions of the parties, the Magistrate Judge was satisfied that Mahmoud had a trial strategy without having to rely on his own testimony. The Magistrate Judge thus recommended that Mahmoud need not be disqualified on the basis that he would be a witness at trial.

The government also raised the concern that Mahmoud's relationship with a former client created a conflict requiring disqualification. In 2005, Mahmoud represented Duke Thietje for the purpose of creating a foreign trust; legal work unrelated to Kiley or the charged Ponzi scheme. Through the course of this representation, Thietje made certain disclosures to Mahmoud regarding his financial and employment situation. The attorney/client relationship ceased after

a fee dispute.

Duke Thietje was also an early investor in the currency program promoted by Cook and Kiley. Thietje's initial $300,000 investment was placed with a large currency trading firm called Refco, Inc. One week after this investment was placed, Refco declared bankruptcy. Subsequent to the bankruptcy, Thietje repeatedly made inquiries of Kiley as to the status of his investment. Ultimately, when Thietje was not able to get his money back, he sued Kiley in state court. Based on Thietje's experience with the currency program, the government informed the parties that it intended to call Thietje as a key witness in its case in chief against Kiley.

In determining whether Mahmoud should be disqualified from representing Kiley in light of his prior relationship with Thietje, the Magistrate Judge looked at whether privileged attorney/client information may be implicated in the course of Mahmoud's cross-examination of Thietje. The Magistrate Judge found that it was likely such privileged information could be implicated, and that a conflict existed. The Magistrate Judge further found that the conflict was not severe, that the attorney/client relationship ended years before Kiley became Mahmoud's client and that when the Kiley/Mahmoud

attorney/client relationship commenced, Thietje was no longer investing with Cook or Kiley.

The Magistrate Judge then inquired of Kiley as to whether he would waive the conflict of interest between Mahmoud and Thietje. On the record, Kiley provided an unequivocal waiver of any conflict of interest and stated that he wanted Mahmoud to continue as his attorney. Based on this waiver, the Magistrate Judge recommended that disqualification was not necessary based on a conflict of interest involving Duke Thietje, noting that co-counsel could cross-examine Thietje at trial.

The Magistrate Judge also addressed the question of a conflict of interest arising from Mahmoud's prior as well as current representation of Stephen Nortier. The government asserted that Nortier had information adverse to Kiley based on Nortier's prior relationship with Kiley when he was hired to secure radio air time for Kiley's radio program. The government asserted that during that relationship, Nortier's business created the website www.patkiley.com, and that the website contained false claims about Kiley's qualifications as an investment advisor and about the safe and secure nature of the currency program Kiley promoted. If called as a witness at trial, the government asserted that

Nortier would testify that Kiley was the source of this false information.

In response, Mahmoud asserted that Nortier would provide a waiver indicating that he had no objection to Mahmoud representing Kiley at trial or that Mahmoud could cross-examine him[3]. He further argued that Nortier did not create Kiley's website.

The Magistrate Judge found that with respect to Nortier, a conflict of interest existed, and advised Kiley of his right to separate and independent counsel free from any conflict of interest that may arise from Mahmoud's representation of Nortier, and explained the difficulties his counsel may have in representing both Kiley and Nortier. On the record, Kiley again stated his unequivocal waiver of any conflict of interest and that he wanted Mahmoud to be his attorney.

In a Report and Recommendation dated November 10, 2011, the Magistrate Judge recommended that Mahmoud not be disqualified at that time. Neither party objected to the Magistrate Judge's recommendation and this Court adopted

---

[3]A written waiver from Nortier was later filed. See Doc. No. 130. At the evidentiary hearing, Nortier testified that he did not remember reading the waiver, and that he did not remember signing the document, suggesting that Mahmoud mixed it in with bankruptcy documents he was to sign. (Id. at 89.)

the Report and issued an Order finding that Mahmoud would not be disqualified.

**B.      Post Conviction**

Kiley was sentenced on July 16, 2013 to a term of imprisonment of 240 months: 180 months on Counts 1 through 13 to be served concurrently; and 60 months on Counts 22 and 23 to be served concurrently, but consecutive to the term of imprisonment for Counts 1 through 13.  The sentence was a downward variance from the applicable guideline range of life imprisonment.

On appeal, the Eighth Circuit affirmed Kiley's conviction and sentence. United States v. Beckman et al., 787 F.3d 466, 488 (8th Cir. 2015) reh'g denied (Jun. 17, 2015) and reh'g and reh'g en banc denied (Jun. 17, 2015).  One argument Kiley raised on appeal was whether he was denied effective assistance of counsel on the basis that trial counsel labored under multiple conflicts of interest while representing him.  Kiley argued that despite the pretrial hearing on the government's motion to inquire and Kiley's unequivocal waiver, the Court nonetheless erred by not considering the conflict inherent in Count 23 - that Kiley was convicted of a crime that implicated Mahmoud.  Id. 787 F.3d at 488.

Kiley argued that at trial, several witnesses testified as to Mahmoud's receipt of the charged wire transfer, and that Mahmoud even referred to himself in the first person when questioning Kiley's administrative assistant. Kiley argued the potential conflict regarding Count 23 was so obvious that the Court should have investigated the matter whether or not Mahmoud raised it on Kiley's behalf and that such conflict was so grave it violated Kiley's Fifth Amendment right to due process. Id. at 489. The Eighth Circuit disagreed.

> In this case, the district court relied on (1) Mahmoud's assurance that no conflict existed and his adamant response to the government's motion for inquiry and (2) Kiley's clear statement to the magistrate judge he wanted Mahmoud to represent him—"I want to keep Mr. Mahmoud." Unlike Wood, the government's motion for inquiry did not apprise the district court of the Count 23 issue Kiley now raises. We therefore reject Kiley's due process challenge raised under the Fifth Amendment, and we find the district court was not required to address sua sponte the potential Count 23 conflict in the midst of this complex and lengthy trial.

Id. at 490.

With respect to Kiley's ineffective assistance of counsel claim, the Eighth Circuit noted that the district court had not heard arguments about the inherent conflict in Count 23, and because Kiley had to show that the alleged conflict of interest had an adverse effect on counsel's performance, the court declined to address it on direct appeal. Id. "Whether the alleged Count 23 conflict resulted

in ineffective assistance by Mahmoud is more appropriately addressed in a §

2255 proceeding with the benefit of the fact-finding and appraisal by the trial

judge, who is in a better position to assess Mahmoud's performance." Id.

On January 22, 2016, Kiley filed the instant habeas petition and on

December 16, 2016, the Court held an evidentiary hearing and heard testimony

from H. Nasif Mahmoud, Stephen Nortier and Robert Sicoli and admitted a

number of exhibits.

## III.    Standard of Review

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence . . .

claiming the right to be released upon the ground that the sentence was imposed

in violation of the Constitution or laws of the United States, or that the court was

without jurisdiction to impose such sentence . . . or is otherwise subject to

collateral attack, may move the court which imposed the sentence to vacate, set

aside or correct the sentence."  28 U.S.C. § 2255(a).  Section 2255 is intended to

provide federal prisoners a remedy for jurisdictional or constitutional errors.  Sun

Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011).  It is not intended to be a

substitute for appeal or to relitigate matters decided on appeal.  See Bousley v.

United States, 523 U.S. 614, 621 (1998); Davis v. United States, 417 U.S. 333, 346-47

(1974)).

>Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice. A movant may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error.

United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citations omitted).

## IV.    Claim of Actual Conflict of Interest

In his petition, Kiley claims that his convictions should be vacated and set aside because his trial counsel labored under an actual conflict of interest that violated his constitutional right to effective assistance of counsel based on counsel's connections to the fraudulent currency program.

### A.    Standard

The right to counsel includes the right to representation that is free from conflicts of interest. Wood v. Georgia, 450 U.S. 261, 271 (1981). When counsel is burdened by an actual conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." Strickland v. Washington, 466 U.S. 668, 692 (1984). An actual conflict of interest exists when the interests of the attorney and that of the client "diverge with respect to a material factual or legal

issue or to a course of action." <u>United States v. Edelmann</u>, 458 F.3d 791, 807 (8th

Cir. 2006).  To be entitled to relief, however, a defendant raising an ineffective

assistance of counsel claim, who did not object to his attorney's conflict of interest

at trial, "must demonstrate that an actual conflict of interest adversely affected

his lawyer's performance." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980).[4]  Thus,

the Court must determine whether Mahmoud had an actual conflict, and if so,

whether such conflict adversely affected his performance at trial.

Prior to addressing the merits of Kiley's claims, it is important to note that

this Court has presided over this case since the Indictment was handed down in

July 2011.  The Court also presided over the <u>Phillips</u>, <u>SEC</u> and <u>CFTC</u> cases and is

thoroughly familiar with all aspects of the charged conspiracy and the fraudulent

currency program.   In addition, the Court presided over the eight week criminal

trial and heard the testimony of all of the witnesses and reviewed the hundreds

of exhibits that were introduced during trial.  As such, the Court is familiar with

--------

[4]The government raises the argument that <u>Sullivan</u> may not apply here, noting that the
Supreme Court has noted that "[w]hether <u>Sullivan</u> should be extended to [cases not involving
multiple representation] remains . . . an open question." <u>Minkens v. Taylor</u>, 535 U.S. 162, 176
(2002)  The Eighth Circuit has not yet ruled on the exact scope of <u>Sullivan</u>, but noted in its
decision as to Kiley's appeal of his conviction and sentence that the <u>Sullivan</u> standard would
apply to Kiley's claim of conflict of interest and ineffective assistance of counsel.  <u>Beckman et al.</u>,
787 F.3d at 490 n.14.  Accordingly, the Court will apply the <u>Sullivan</u> standard to Kiley's claim.

the trial strategies used by the government and the defense counsel and is in the best position to assess counsel's performance.   Beckman et al., 787 F.3d at 490. Thus, when assessing the merits of Kiley's claims, the Court takes into consideration the case as a whole and the substantial evidence presented at trial to prove Kiley's guilt on all counts against him in the Indictment, not just Count 23.

In addition, it must be emphasized that in determining the merits of Kiley's petition, the Court considers which evidence was admitted at trial.  As discussed below, many of the arguments and evidence submitted in support of Kiley's petition were not a part of the trial record.

Viewed in this context, the Court recognizes that Mahmoud's representation of Kiley was not perfect, and that mistakes were made. Nonetheless, Kiley has not demonstrated that he is entitled to relief under Sullivan.

### B.    Actual Conflict

An actual conflict exists where the attorney is accused of a crime that is similar to or related to those of his client.  See, e.g., Mannhalt v. Reed, 847 F.2d 576, 581 (9th Cir. 1988) (finding petitioner entitled to habeas relief where defense

counsel was accused of purchasing stolen goods during cross-examination of a

witness, creating an actual conflict of interest, and that such conflict affected

counsel's performance); United States v. Cancilla, 725 F.2d 867 (2d Cir. 1984)

(finding defense counsel burdened by conflict of interest where he was accused

of participating in insurance fraud scheme similar to that of his client); United

States v. Zepp, 748 F.2d 125 (3d Cir. 1984) (finding actual conflict of interest arose

where counsel had equal access and opportunity while alone in the house with

his client to flush cocaine down the toilet); United States v. Lacerda, 929 F.

Supp.2d 3489 (D.N.J. 2013) (finding that counsel must be disqualified based on

evidence that counsel played a role in a key event that furthered the charged

conspiracy, making him a fact witness whose testimony could inculpate client);

United States v. Kolodesh, No. 11-464, 2012 WL 1156334 (E.D. Pa. Apr. 5, 2012)

(finding that counsel must be disqualified based on conflict of interest that arose

because counsel was implicated in the client's crime).

    Kiley argues there is evidence in the record that shows: 1) Mahmoud was

deeply entangled in the charged fraudulent scheme and faced potential civil and

criminal liability for his connection to the fraud; 2) Mahmoud had an actual

conflict of interest with Kiley because of this potential liability; and 3) the conflict

rendered Mahmoud's assistance ineffective under the Sixth Amendment.

In support, Kiley highlights the following evidence:

**1.** **$100,000 Retainer**

The <u>Phillips</u> lawsuit was filed on July 7, 2009. In that case, the plaintiffs

alleged that they had been defrauded as a result of their investment in the

currency program promoted by Trevor Cook, Kiley and others, as well as a

number of business entities, including UBS Diversified and Oxford Private Client

Group, that were involved in the currency program. This Court entered orders

freezing the bank accounts of the defendants at Wells Fargo and Associated Bank

until a trial on the merits of the plaintiffs' claims.

In response to the <u>Phillips</u> lawsuit, Cook reached out to Mahmoud about

legal representation for Kiley. Mahmoud responded by forwarding to Cook a

Professional Services Agreement ("PSA") between Pat Kiley of Universal

Brokerage Services FX and Mahmoud. (Def. Ex. 19.)[5] The PSA provided that by

entering into such agreement, Kiley would engage Mahmoud's services to

prevent Kiley from being named a defendant in the <u>Phillips</u> lawsuit and to

---

[5]At the evidentiary hearing, Mahmoud assured the Court and counsel that he would locate an
executed copy of the PSA and submit it to the Court, but to date he has failed to do so.

prevent Kiley from becoming a party in a criminal case. (Id.) The PSA further

provided that the initial retainer would be $100,000, and that such fee should be

wired to Mahmoud's account as listed therein. (Id.) On July 13, 2009, $100,000

was wired to Mahmoud's bank account from the account of Basel Group LLC at

Associated Bank. (Gov't Ex. 2.)

Thereafter, Mahmoud moved for admission Pro Hac Vice on behalf of the

UBS business entities in the <u>Phillips</u> case. (Civ. No. 09-1732 [Doc. No. 81] Motion

for Admission Pro Hac Vice.)

On November 23, 2009, the United States Commodity Futures Trading

Commission ("CFTC") and the Securities and Exchange Commission ("SEC")

filed actions against Cook, Kiley and others, claiming they engaged in a massive

investment fraud, and that they solicited and accepted over $190 million from

more than 900 victims.[6] On that same day, the Court issued asset freeze orders to

freeze all assets held by the law firms representing the defendants in those cases,

which included Cook, Kiley and a number of business entities. One provision of

the asset freeze order entered in the SEC matter specifically identified a number

of law firms that held funds on behalf of the defendants, including Peter Wold,

---

[6]Civil Nos. 09-3332 and 09-3333.

P.A. and Mahmoud's firm, McKinzie, Wilkes & Mahmoud. (Civ. No. 09-3333, Doc. 14.)

Kiley had retained Peter Wold on July 3, 2009 to represent him in response to the investigation being conducted by the SEC, and sent him a retainer fee in the amount of $100,000. As a result of the asset freeze orders, Wold filed motions seeking relief from those orders in order to keep the retainer fee. The motions were granted in both cases on January 27, 2010. Even though Mahmoud's firm was also specifically named in the asset freeze order, he never brought a motion seeking relief as to the $100,000 wire transfer he received on July 13, 2009, which is the subject of Count 23.

At the evidentiary hearing on Kiley's habeas petition, Mahmoud admitted that he should have filed a motion seeking relief from the asset freeze order. At that time, however, he believed he had earned the $100,000 retainer fee by the time the asset freeze order was issued, and that such a motion was not necessary. (Hearing Transcript ("HT") at 118-21.)

### 2. Public Scrutiny of Mahmoud's Connection to Fraud/Exposure to Clawback by Receiver

Kiley claims that Mahmoud's connection with the alleged fraud and his

receipt of the $100,000 retainer from Trevor Cook in July 2009 drew scrutiny from the government and the Receiver, and was well known to the public, as is evidenced by questions and answers posted on the Receiver's website discussing Mahmoud and Kiley.  (Def. Ex. 26.)

Further, Kiley argues that evidence gathered in the SEC lawsuit demonstrates that Mahmoud could be implicated in criminal activity. Specifically, on June 30, 2009, $183,450 had been transferred from an account in the name of UBS Diversified Growth LLC to an account with Antigua Overseas Bank that belonged to an offshore gaming business.  In an email dated November 6, 2009 from the Assistant VP of Operations at the Antigua Overseas Bank, Mahmoud was informed that the bank could not return the funds to UBS Diversified Growth LLC by wire transfer because of legal matters involving that entity[7], but that a new check would be issued to UBS Diversified Growth LLC and sent to Trevor Cook.  (Def. Ex. 29.)  After receiving this email, Mahmoud emailed Cook and his attorney, John Thompson, instructing them that when Cook received the check from the Antigua Overseas Bank, the check was to be sent to Mahmoud's office for "safe keeping."  (Def. Ex. 30.)

---

[7]This is in reference to the asset freeze orders issued in the <u>Phillips</u> case in July 2009.

Kiley argues that this evidence demonstrates that Mahmoud was involved in a last ditch attempt to gain control of these funds, and that at that time, Mahmoud knew such funds were illicit victim funds. Kiley further argues that if the transaction had been consummated, it could have generated criminal liability for Mahmoud under the wire fraud and mail fraud statutes. Kiley further argues that by simply exchanging emails with Cook and the Antigua Overseas Bank, Mahmoud subjected himself to co-conspirator liability. Finally, failure to turn over the funds would have violated the asset freeze orders.

At the evidentiary hearing, Mahmoud testified that his attempts to obtain the check from the Antigua Overseas Bank were part of his and Kiley's plan to protect the money from Trevor Cook. (HT at 66.) He testified that prior to the November 6, 2009 email, he received a check from the bank and deposited it in his firm's client funds account. Subsequently, the bank stopped payment on the check after determining the check had to be sent to Cook. (Id.) Mahmoud admitted that he did this even though the asset freeze order in the Phillips case applied to those funds. (Id.) He testified that he did not turn over the check to the Court or to the Receiver because he wanted to make sure the check would be honored first. (Id. at 67.) Although he made attempts to retrieve the second

check sent by the bank, he testified that he never received that check.  (<u>Id.</u> at 69.)

### 3.    Mahmoud's Connection to Trevor Cook

Kiley further argues that Mahmoud had more than a passing connection to Trevor Cook.  Kiley asserts that in early 2009, Cook invited Mahmoud to a meeting in Chicago.  (HT at 109.)  The purpose of the meeting was to introduce potential traders to the currency program.  (<u>Id.</u> at 110.)  Mahmoud testified that by that point, he and Cook had a mutual hatred of each other.  (<u>Id.</u>)  Although he could not recall any specifics, Mahmoud conceded that Cook may have offered him work on the Panama casino during the meeting, but if such an offer was made, it was only to show comradery to the potential traders present at that meeting.  (<u>Id.</u>)

Cook also hired Mahmoud in July 2009 to represent Kiley in the <u>Phillips</u> case, and negotiations concerning that representation were handled solely by Cook.  (HT at 33.)  Around that time, Cook also invited Mahmoud to stay at the Van Dusen mansion, and from July to October 2009, Mahmoud stayed on and off at the mansion as a guest of Cook.  (<u>Id.</u> at 57.)  During his stays, Mahmoud engaged in discussions about legal matters with Cook, but did not engage in any social interactions with him or the other occupants of the mansion because of a

mutual disdain.  (Id. at 59.)

As further evidence that Mahmoud was connected to Cook and the fraudulent scheme, Kiley asserts that when retained in July 2009, Mahmoud understood that one purpose of the retainer was to "assist in the continued effort to keep Pat Kiley on the air as radio personality in all of the present radio markets that he has nationally."  (Def. Ex. 19 (PSA at 2).)  Thus, even though the currency program was imploding under his nose, Mahmoud believed that part of his duties as legal counsel was to make sure that Kiley continued to work with Cook.

At the evidentiary hearing, Mahmoud explained that the "plan was to have Kiley slowly show that if things were going wrong in the program, he was simply going to tell people the truth."  (HT at 36.)  Kiley argues that Mahmoud doesn't explain how such a plan would serve the potential victims who tuned into the radio program and that his efforts to prolong the fraud when it was on the edge of collapse exposed Mahmoud to potential liability.

Stephen Nortier also provided testimony at the evidentiary hearing.  As discussed previously, Nortier ran a media placement business which had purchased air time for Kiley's radio show at stations around the country

beginning in 2005. Nortier was also a client of Mahmoud as of 2001, and

Mahmoud helped prepare Nortier to testify before the grand jury that indicted

Kiley. (<u>Id.</u> at 83.)

Nortier testified that he was also at the meeting in Chicago in early 2009.

(<u>Id.</u> at 84.) He testified that at the meeting, Cook talked about making money

while in college by selling alcohol to underage students. (<u>Id.</u> at 85.) Later, the

topic of the Panama casino was discussed at which time Cook suggested that

Mahmoud do some work for him in Panama. (<u>Id.</u> at 86.) Nortier recalled that

Mahmoud seemed eager to accept the offer. (<u>Id.</u> at 86.)

Nortier also testified that in June 2009, he received a call from Mahmoud.

Mahmoud told him "there's been some problems with Trevor," and as a result,

Kiley's radio programs had to be suspended immediately. (<u>Id.</u> at 86.) Mahmoud

also mentioned that he believed Kiley would be back on the air in the fall. (<u>Id.</u> at

87.)

### 4. Refco and Duke Thietje

At trial, the government had argued that Kiley's knowledge of the fraud

could be inferred, in part, from the collapse of the Refco foreign exchange

investment, which was one of the investments in which Cook placed investor

funds. One investor, Duke Thietje, testified at trial that he invested $406,000 in Refco in 2005 after listening to Kiley's radio program. Shortly after investing his funds, Refco declared bankruptcy. The government argued this evidence was important to show that after the Refco bankruptcy, Kiley understood that not all currency programs were safe, yet he continued to promote the currency program to investors as a safe investment.

At trial, Mahmoud did not cross-examine Thietje. Kiley now argues the reason he failed to conduct cross-examination of Thietje was because Mahmoud may have been connected to the Refco investments and the loss of Thietje's investment. In support, Kiley points to an email string in which Thietje is seeking information from Kiley about his Refco investment. Kiley responded by suggesting that Mahmoud could provide him that information. (Def. Ex. 3 at 177-008.)

At the evidentiary hearing, Mahmoud denied having any knowledge of Thietje's investment in Refco. (HT at 30.) Mahmoud testified that when Thietje began to inquire about his investment with Refco, Kiley's suggestion that Mahmoud may have information for Thietje was simply a "subterfuge" or cover. (Id.) "I never had two conversations with Kiley regarding Thietje's balances or

anything else.  That's just a lie."  (Id.)  Despite his claim that Kiley was lying to

Thietje about Mahmoud's knowledge of Refco, Mahmoud conceded that the

email exchange was part of the government's case and was submitted to the jury.

(Id. at 31-32.)

Mahmoud further testified that his decision not to cross examine Thietje

was a strategic one, "[b]ecause I didn't think putting Pat in a situation where he

was not responsive to Thietje had no real good answer, and I didn't want him to

be smeared more in cross-examination.  Thietje had put money in and that

money was lost and there was no way that any good could come out of just

hitting that dead horse again."  (HT at 136.)

### 5.      Other Connections to Cook's Fraud

Kiley asserts there is additional evidence that suggests more connections

between Mahmoud and the fraudulent currency scheme.  For example, Kiley

cites to a September 2008 bank account statement which shows a $15,000 wire

transfer to Mahmoud from the account of UBS Diversified Growth LLC.  (Riach

Decl. Ex. F.)  At the hearing, Mahmoud testified that he received this money to

represent Kiley in a state court action in Virginia, where the state accused Kiley of

selling securities without a license.  (HT at 7.)

24

There is also evidence concerning an interview that investors Kenneth Locklin and Hans Reske had with Mahmoud and Kiley in July 2009. At that meeting, Mahmoud allegedly assured Locklin and Reske that their investments illiquidity was due to the bankruptcy of Crown Forex, and that once the bankruptcy was cleared up, investors would be able to get their funds back. (Id. Ex. G.)

Evidence was also produced to show that Cook had given Kiley a $180,000 check from betjamaica.com, and that Kiley had given the check to Mahmoud. The whereabouts and status of the check are unknown. (Id. Ex. H.)

### 6. Trial Testimony Connected Mahmoud to Fraud

Ultimately, multiple witnesses testified at trial that Mahmoud was the recipient of the $100,000 wire transfer that is the subject of Count 23 of the Superseding Indictment, including the SEC's accountant, Scott Hlavacek, IRS Special Agent Matthew Schommer, FBI Agent John Tschida and Kiley's assistant Julia Gilsrud.

### 7. Discussion

Kiley argues that Mahmoud's interests diverged from his interests when he accepted the $100,000 wire transfer and opened himself up to the risks of

potential criminal liability, civil forfeiture and disciplinary action.  He further

argues that Mahmoud would reasonably have feared that evidence adduced at

trial about his involvement in the wire transfer or other conduct related to the

fraud could fortify his connections to Cook's scheme such that the government

would initiate an investigation or be subject to disciplinary action or civil

forfeiture.

A petitioner need not present direct evidence of wrongdoing for the Court

to find that an actual conflict exists.  See Zepp, 748 F.2d at 136 (finding "[w]hile

there is no direct evidence of wrongdoing by trial counsel, it is not necessary to

assume wrongdoing to conclude that he had an actual conflict of interest—trial

counsel had equal access and opportunity while alone in the house with Zepp to

flush cocaine down the toilet.  It is clear that he was potentially liable for aiding

and abetting or encouraging the destruction of evidence.")  A court may find that

an attorney operated under an actual conflict based on evidence that

demonstrates the attorney's potential liability.  Id.

Based on its review of the record, the Court finds there is no direct

evidence of wrongdoing by Mahmoud.  In addition, the Court is not persuaded

that sufficient evidence was presented to demonstrate Mahmoud's potential

liability, as none of the evidence presented shows that Mahmoud knew or should

have known that the currency program was fraudulent at the time he accepted

the wire transfer in July 2009 or that he was "deeply entangled" in the fraudulent

scheme.

To show such entanglement, Kiley would have to present some evidence

that Mahmoud acted in some way to further the currency scheme, such as

providing legal work directly related to the currency scheme, or creating

documents used to further the scheme.   Instead, the record demonstrates that the

work Mahmoud performed for Kiley prior to the discovery of the fraud was

unrelated to the currency scheme, and after the allegations of fraud were first

made public with the commencement of the <u>Phillips</u> case, the record shows only

that Mahmoud acted as Kiley's counsel to defend against such fraud allegations.

At the hearing, Mahmoud repeatedly testified that he did not know the currency

program was fraudulent, and that he finally understood the nature of the

program after preparing for trial.  The Court found Mahmoud's testimony to be

credible.

With regard to the emails written by Kiley to Duke Thietje about the Refco

investments, the Court notes that Kiley's responses mention Mahmoud without

making clear the role played by Mahmoud in Refco.  Nor is Mahmoud copied on any of these emails.  At the evidentiary hearing, Mahmoud testified that he was never sent copies of those emails, and that Kiley was most likely trying to use Mahmoud as a cover up.  Kiley did not present any evidence to dispute Mahmoud's account.  The Court thus finds these emails do not show that Mahmoud was deeply entangled in the currency scheme.

With regard to the fact that Mahmoud attended a meeting in Chicago with members of the conspiracy, and that Cook offered him work on the Panama casino, there is no evidence that Mahmoud performed such work on the casino or on any other aspect of the currency program itself.  The fact that Mahmoud appeared interested in the casino work does not show that he had to have known the true nature of the currency scheme.

The same is true regarding the fact that Mahmoud spent time at the Van Dusen mansion.  Prior to that time, Mahmoud testified that he believed the currency program was successful based on his knowledge of early investor successes.  (HT at 108.)  After the Phillips litigation commenced and he accepted the wire transfer that is the subject of Count 23, Mahmoud testified he had no reason to believe the money was "dirty".  (HT at 121.)  Later, when he began

staying at the mansion, Mahmoud testified that he continued to believe the currency trading program was not a fraud. (Id. at 125.) He testified that while at the mansion, he participated in many meetings with Cook, Kiley and others in which they discussed litigation strategy with regard to the Phillips case, but that he did not engage with them socially. (HT at 56, 59-60.) Again, Kiley did not present any evidence that disputes Mahmoud's account.

Finally, with respect to the $183,450 check issued by the Antigua Overseas Bank, the Court agrees Mahmoud was required to immediately turn over that check to the Court pursuant to the asset freeze order issued in the Phillips case. Despite this misstep on Mahmoud's part, the Court finds it does not show that Mahmoud was deeply entangled in the fraudulent currency program. Further, this evidence was admitted in the SEC case only. Therefore, the jury was not made aware of the fact that Mahmoud attempted to have these funds directed to Kiley.

Accordingly, the Court finds that Kiley has not demonstrated that Mahmoud had an actual conflict of interest.

## C.     Adverse Effect

Even if Kiley could show that Mahmoud operated under an actual conflict

of interest, Kiley must also demonstrate that the conflict of interest adversely effected Mahmoud's representation. "The effect must be actual and demonstrable, causing the attorney to choose to engage or not to engage in particular conduct." Morelos v. United States, 709 F.3d 1246, 1252 (8th Cir. 2013). To make this showing, Kiley must 1) identify a plausible alternative defense strategy or tactic; 2) show that the alternative strategy was objectively reasonable; and 3) establish that Mahmoud's failure to pursue that strategy or tactic was linked to the actual conflict. Id. Based on the record, the Court finds that Kiley has failed to make this required showing.

### 1. Argument

Kiley argues that Mahmoud's connection to Count 23 tainted his advocacy and damaged his credibility in the eyes of the jury, and his potential criminal liability impaired his defense. Kiley further asserts that Mahmoud did not pursue alternative strategies, and that failure to do so adversely effected his representation. One such strategy was to obtain a stipulation preventing identification of Mahmoud as the attorney referenced in Count 23. Instead, multiple witnesses testified that the transfer of allegedly laundered money went to Mahmoud. The government also explicitly referenced Mahmoud and the wire

transfer in its closing arguments.

Kiley further asserts that Mahmoud failed to put forth any evidence, or even suggest, that the $100,000 came from legitimate sources. He could have called as witnesses other lawyers present at the Van Dusen mansion during the relevant time period, or he could have called Trevor Cook to testify, who Mahmoud claimed was the payor of the $100,000. Kiley argues that Mahmoud failed to do so because eliciting such testimony would have complicated matters further for Mahmoud by highlighting the fact that other attorneys for co-defendants, but not Mahmoud, had all successfully moved to have the Court ratify their receipt of retainer funds and exempt those retainer funds from the Court's freeze order.

Kiley thus argues that Mahmoud's failure to vigorously defend against Count 23, as well as the failure to return funds, are linked to the conflict of interest. He asserts that the strategies and tactics foregone clearly conflicted with Mahmoud's interest to avoid introduction of inculpating evidence. The mere possibility of the influence of the conflict on these decisions links them to the conflict and failure to pursue them constitutes an adverse effect requiring reversal.

In support, Kiley submitted a declaration from Robert Sicoli, a criminal

defense attorney with decades of experience.  In his declaration, Sicoli opined

that based on Mahmoud's connection to Count 23, Mahmoud labored under a

conflict of interest.  (Sicoli Decl. ¶ 5.)  He further opined that Mahmoud's

credibility with the jury was irrevocably diminished by the fact that he was

repeatedly linked to the crime his client was accused of committing.  (Id.)  Sicoli

further noted there is no evidence that Kiley was made aware of this conflict,

therefore he could not waive it. (Id. ¶ 6.)  Sicoli further opined that such conflict

adversely effected Mahmoud's representation of Kiley because he would have

lost credibility with the jury once they became aware of Mahmoud's connection

to Count 23.  (Id. ¶ 7.)  In addition, Mahmoud failed to present any evidence that

the money at issue in Count 23 was legitimate.  (Id.)  Also, by putting his own

unsworn testimony before the jury when questioning Kiley's former secretary,

Mahmoud further diminished his effectiveness as an advocate.  (Id.)

Sicoli also noted that at trial, three lawyers testified that after reviewing the

operations of Trevor Cook's currency program, they all concluded the program

was fraudulent.  (Id.)  Sicoli opined that the jury could have easily inferred that

Mahmoud had come to the same conclusion, yet he agreed to accept the $100,000

wire transfer and stay on the case. (Id. ¶ 8.) Sicoli concluded "In my view, Mr. Mahmoud should have either declined to represent Mr. Kiley in a case in which he would be named or should have arranged for substitute counsel to take over. At a minimum, Mr. Mahmoud should have sought a stipulation or ruling from the court keeping his identity away from the jury." (Id. ¶ 9.)

At the evidentiary hearing, Sicoli provided testimony in support of his opinions. First, he testified that he believed that Mahmoud's credibility was damaged with the jury as soon as they learned that he received the $100,000 wire transfer at issue in Count 23. (HT at 155-56.) Second, once Mahmoud's involvement in the case was known, he had an actual conflict with defending Kiley, because Mahmoud had an interest in making sure that he didn't look bad, which effected his ability to cross-examine witnesses. (Id. at 157.) Third, Sicoli testified that from the record, he believed that Mahmoud should have been a witness in the case for Kiley, as he had information that could explain the circumstances of his receiving the $100,000. (Id.)

Sicoli further testified as to alternative steps Mahmoud could have taken in his representation of Kiley. Sicoli opined that first, Mahmoud should have sought relief from the asset freeze order, because if he had, perhaps the

government would not have charged Kiley in Count 23.  (Id. at 158.)  Sicoli

further testified that Mahmoud could have asked the Court to exclude any

exhibits that referenced him, and the Court could have ordered that with respect

to Count 23, the money was owed to an attorney, without identifying Mahmoud.

(Id. at 159.)

During cross-examination, Sicoli conceded that Count 23 had a mens rea

requirement - that to be guilty of money laundering, one would have to know

that the monetary transaction was criminally derived - and that Mahmoud

repeatedly denied that he knew the money he received was "dirty money."  (Id.

at 163.)  Sicoli further conceded that based on the summary prepared by the

SEC's accountant that showed that all of the money in the Basel Group account

was "dirty," Sicoli would not have defended Count 23 on the basis that the

money involved was "clean."  (Id. at 177.)

> ## 2.    Discussion
>
> As the Supreme Court recognized in Strickland
>
> Judicial scrutiny of counsel's performance must be highly deferential. It is
> all too tempting for a defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to conclude that a
> particular act or omission of counsel was unreasonable.  A fair assessment

of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

466 U.S. at 689 (internal citations omitted).

With this in mind, and based on the record as a whole, this Court finds that Kiley has not demonstrated that Mahmoud's credibility with the jury was damaged once they learned that he received the $100,000 referenced in Count 23, or were exposed to a government exhibit in which Mahmoud's name appeared.

Kiley argues that the jury could reasonably infer that Mahmoud knew or should have known that the wire transfer at issue in Count 23 was not legitimate based on his knowledge of the fraud in the Phillips case. The record does not support this argument because the jury was not presented with sufficient evidence to support such an inference. The jury was informed that Mahmoud was the recipient of the funds at issue in Count 23. The jury was also presented with evidence, Government Ex. 177, in which Kiley references Mahmoud in

response to questions posed to him by Duke Thietje. The remainder of the evidence submitted in support of Kiley's habeas petition was not before the jury.

In so finding, the Court notes the facts of this case are distinguishable from those in <u>Dawan v. Lockhart</u>, 31 F.3d 718 (8th Cir. 1994). In <u>Dawan</u>, appointed counsel had a clear conflict of interest as he represented the defendant and his co-defendant in a burglary and theft case. When the co-defendant entered a plea of guilty to the charged crimes, he provided a sworn statement to the court that implicated the defendant. <u>Id.</u> 31 F.3d at 719. At the defendant's trial, however, he testified that the defendant was in no way involved in the charged crime. <u>Id.</u> at 720. On cross-examination, the prosecuting attorney asked the co-defendant about his previous testimony and highlighted the fact that defense counsel had represented him at his plea hearing. <u>Id.</u> The co-defendant admitted that he had previously lied under oath, and on re-direct, defense counsel asked him if his trial testimony was true, to which he answered in the affirmative. <u>Id.</u> Based on those facts, the Eighth Circuit found there was an actual conflict of interest, and that such conflict adversely effected his representation because the prosecutor's comments before the jury made defense counsel look less credible.

In this case, there is no actual conflict of interest and contrary to Kiley's

arguments, the jury was not presented with evidence from which they could reasonably infer that Mahmoud knew, or should have known, the funds at issue in Count 23 were not legitimate when received. Being the recipient of funds that are the subject of a money laundering charge is not unlawful unless the recipient knows the money was criminally derived. <u>See</u> 18 U.S.C. § 1957 (liability predicated on: 1) engaging in a monetary transaction; 2) in property **known** to the transactor to have been criminally derived; 3) in an amount of $10,000 or more). Unlike the prosecutor in <u>Dawan</u>, the government did not, in front of the jury, accuse Mahmoud of wrongdoing or present any evidence that suggested Mahmoud had engaged in any wrongdoing when he accepted the wire transfer in July 2009.

With respect to Government Exhibit 177, which included the emails between Kiley and Duke Thietje, that exhibit was introduced through Thietje. During direct examination, Thietje was not asked any questions about the fact that Mahmoud was mentioned in Kiley's emails. (Trial T. at 861-72.) In addition, the references to Mahmoud are incidental, and do not describe Mahmoud taking any particular action with regard to Thietje's investment in Refco. Although the jury clearly saw this exhibit during trial, and could review the exhibit during

deliberations, the Court can only speculate as to the jury's reaction to seeing Mahmoud's name in those emails.

Other than the fact that Mahmoud received the wire transfer at issue in Count 23 and the emails included in Government Exhibit 177, the jury was not presented with the other evidence raised in this petition - that he spent time at the Van Dusen mansion, the Chicago meeting with co-conspirators, the apparent terms of the July 2009 PSA between Mahmoud and Kiley, or Mahmoud's handling of the check in the amount of $183,450 from the Antigua Overseas Bank.

Kiley also argues that an alternative defense strategy not pursued by Mahmoud was to obtain substitute counsel given the taint on Mahmoud's advocacy because of the conflict of interest. He further argues Mahmoud should have obtained a stipulation preventing identification of Mahmoud as the attorney in Count 23. Because the Court rejects Kiley's argument that Mahmoud's advocacy was tainted after the jury learned he was the recipient of the wire transfer at issue on Count 23, failure to substitute counsel or obtain a stipulation that Mahmoud not be identified as the recipient of the funds in Count 23 did not adversely effect Mahmoud's representation.

The Court further finds that Mahmoud's trial strategy to forego the defense

that the funds at issue in Count 23 were not criminally derived did not adversely effect his representation at trial given the overwhelming evidence that demonstrated all funds deposited into the Basel Group LLC account were criminally derived.   In fact, Kiley's expert, Robert Sicoli, agreed that based on the evidence presented at trial, he would not have defended Count 23 on the basis that the money involved was "clean."

The Court also rejects Kiley's argument that Mahmoud's failure to bring a motion seeking relief from the asset freeze order adversely effected his representation by foregoing a defense to the money laundering charge in Count 23.  Kiley has not presented a convincing argument that if Mahmoud had obtained permission, after the fact, to retain or use the money at issue in Count 23, such a scenario would be a defense to the charge that **Kiley** committed the crime of money laundering.  As noted previously, criminal liability is based on whether the transactor knew the funds were criminally derived.  A showing that Mahmoud was entitled to retain the funds as a properly earned retainer fee has no bearing on whether Kiley had knowledge that the funds were criminally derived.  In addition, Kiley has not demonstrated that had Mahmoud brought a motion for relief from the asset freeze order, the government would not have

included Count 23 in the Indictment.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Patrick Joseph Kiley's Motion to

Vacate, Set Aside or Correct a Sentence Pursuant to 28 U.S.C. § 2255 [Doc. No.

554] is **DENIED.**

Date: June 8, 2017

s/ Michael J. Davis
Michael J. Davis
United States District Court
